UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BOBBIE JO KOOMAN, PERSONAL
REPRESENTATIVE FOR THE ESTATE
OF ROBERT J. ROMIG, DECEASED,                     CASE No. 1:18-CV-637
and TERRY ROMIG,
                                                  HON. ROBERT J. JONKER
                 Plaintiffs,

v.

BOULDER BLUFF CONDOMINIUMS,
UNITS 73-123, 125-146, INC., d/b/a
BOULDER BLUFF ESTATES
CONDOMINIUM ASSOCIATION, et al.,

                 Defendants.
_____/

## OPINION AND ORDER

### INTRODUCTION

Robert Romig had trouble getting in and out of the Boulder Bluff Estates condominium

unit he lived in with his ex-wife, Terry Romig. So, the Romigs' daughter, Plaintiff Bobbie Jo

Kooman, decided in June of 2016 to install railings on the outdoor steps and porch to assist her

father. But like many condominium associations, the bylaws of the Boulder Bluff Condominium

Association required that condominium owners first obtain permission of the Association's Board

of Directors before making any exterior alterations. The Board approved the railings in August of

2016.

This lawsuit is about the period between Ms. Kooman's initial contact with the Board, or

its property manager, on June 17, 2016, and the Board's August 23, 2016 approval. According to

Plaintiffs, the Defendants' conduct during the intervening weeks amounted to an unlawful denial

and delay of a request by a disabled individual. Plaintiff were not especially prompt in asserting the claim. They waited about 22 months after the Board approved their request to file. They now say Defendants violated the Fair Housing Amendments Act ("FHAA"), 42 U.S.C. § 3601, *et seq.* based on two separate liability theories: (1) a failure to permit a reasonable modification; and (2) disparate treatment. Defendants move for summary judgment. After review of the complete record, the Court GRANTS the motions for summary judgment and DISMISSES this case.

## FACTUAL BACKGROUND

*1.     Robert and Terry Romig Reside at the Boulder Bluff Condominiums*

Robert and Terry Romig divorced in 2006 after Robert retired from his career as a truck driver. (Kooman Dep. 6, ECF No. 50-6, PageID.727). Following the divorce, Ms. Romig moved in with her daughter, Ms. Kooman, for a time and then purchased a unit at the Boulder Bluff Estates Condominiums in 2009. (Kooman Dep at 7, ECF No. 50-6, PageID.728; Quit Claim Deed, ECF No. 50-4, PageID.711; Terry Romig Dep. 6-7, ECF No. 53-14, PageID.966).

About a year after Ms. Romig moved into her condominium unit, her ex-husband also moved into the unit. (Kooman Dep. 7, PageID.728). Ms. Kooman testified during her deposition that her father had been sick with heart problems, and his condition was worsening around that

time.[1]  The family, including Ms. Romig, talked about it, and concluded it would be best for

Mr. Romig to move in with his ex-wife.  (*Id.*).[2]

Ms. Romig's condominium had steps leading into the unit.  Inside, a kitchen, dining room,

living room and half-bath were located on the main floor.  There were two bedrooms and a

bathroom on a second level.  (Kooman Dep. 44, ECF No. 50-6, PageID.765).  Outside, there was

a porch approximately eight inches off the ground.  (Waalkes June 29 email, ECF No. 53-24,

PageID.1011).

### 2.  *Ms. Kooman Requests Railings for Her Father*

At least by June 2016, Mr. Romig had suffered some falls while getting in and out of the

condominium unit.  This was before Ms. Kooman, or anyone else, identified the possibility of

external railings on the unit.  After the falls, Ms. Kooman decided that the unit needed to have

railings on the porch and steps to help her father get up and down, and to provide something for

her father to hang on to.  (Kooman Dep. 18, ECF No. 50-6, PageID.739).  Ms. Kooman testified

---

[1] The summary judgment record contains no medical treatment records relating to Mr. Romig.
However, it appears uncontroverted that Robert Romig was in poor health when he moved in with
his ex-wife.  Ms. Kooman testified during her deposition that her father suffered an untreated heart
attack during his last year of working as a truck driver.  (Kooman Dep. at 9, ECF No. 50-6,
PageID.730).   At some point in the early 2000s he had a pacemaker implanted.  (*Id.* at 10,
PageID.731).  Ms. Kooman also testified that her father had diabetes, and his medication caused
kidney problems.  (*Id.* at 9-10, 12, PageID.730-731, 733).  Mr. Romig also had respiratory
problems, congestive heart failure, and used supplemental oxygen.  (*Id.* at 12, PageID.733). These
problems persisted when Mr. Romig moved into the condominium unit.  He was cared for two to
three times a week by visiting nurses.  They would change the bandages on his wounds and change
the bag to his IV.  He had a stent placed in his arm for his heart medication.  (*Id.* at 14, PageID.735).
He would use a cane or a walker to ambulate, depending on how he was feeling.  (*Id.* at 15,
PageID.736).  He could walk outside the condominium only if someone was walking next to him
(*Id.*).
[2] During her deposition, Ms. Romig testified that her ex-husband had been "real sick" and had
reached out to her for help selling his house because he could no longer afford it.  She asked him
if he'd like to move in with her, and Mr. Romig agreed.  (Terry Romig Dep. 9, ECF No. 53-14,
PageID.967).

that around mid-June 2016 she called Natasha Biegalle, who was employed by Defendant Gerow Management, the property management company for Boulder Bluffs Estates. (Kooman Dep. 18, ECF No. 50-6, PageID.739; Compl. ¶ 31, ECF No. 1, PageID.9). Ms. Kooman says she told Ms. Biegalle that she needed some railings on the porch of her mother's condominium unit because her father "was not very well balanced on his legs, and we didn't want him to fall[.]" (Kooman Dep. 18, ECF No. 50-6, PageID.739). According to Ms. Kooman's testimony, Ms. Biegalle responded that Ms. Kooman or her mother needed to go online and request permission from the association to get the railings installed. (*Id.* at 18-19). Jeff Carpenter, one of the members of the Boulder Bluff Board of Directors, also testified that he told Ms. Romig that she needed a formal application to install the railing. (Carpenter Dep. 7, ECF No. 43-15, PageID.633).[3]

Ms. Kooman sent an email dated June 17, 2016 to Natasha Biegalle which was, Ms. Kooman says, only a few days after speaking with her.[4] Ms. Kooman testified she sent the email because she was instructed to do so by Ms. Biegalle. The email was sent from Ms. Kooman's own email account, though she signed them as coming from her mother. Ms. Kooman stated she

---

[3] The organizational documents of the Boulder Bluff Condominium required the approval of a Board of Directors before any external alterations were made. As a general matter, the units at the Boulder Bluff Condominiums are subject to a master deed (ECF No. 1-1, PageID.22-31), bylaws (ECF No. 1-1, PageID.32-42) and to the covenants and restrictions found in those documents. Article V, § 8 of the bylaws provides for certain use restrictions. Relevant for purposes here, the bylaws state: "In order to provide for congenial occupancy of the Condominium property, and for the protection of the values of the Apartments, the use of Condominium property shall be subject to the following limitations . . . (c) No Co-owner shall make alterations in exterior appearance or structural modifications to his Apartment without the written approval of the Association. The Association shall not approve any alterations or structural modifications which would jeopardize or impair the soundness, safety or appearance of the Condominium Project." (ECF No. 1-1, PageID.38).

[4] During her testimony, Ms. Biegalle testified that the email was the first time she found out about the request for the modification. (Biegalle Dep. 10-11, ECF No. 50-7, PageID.799-800). To the extent this testimony conflicts with Plaintiffs' version of events, the Court accepts for purposes of summary judgment review Ms. Kooman's testimony that there was a phone call before Ms. Kooman sent Ms. Biegalle an email.

signed the emails with her mother's name because Ms. Romig was the owner of the condominium unit and her mother would review the emails before Ms. Kooman sent them. (Kooman Dep. 37-38, ECF No. 50-6, PageID.758-759).[5] The initial email contained Ms. Romig's name and address and stated "[T]his is the railing I have picked Out [sic] and this is what it will look like." (ECF No. 53-5, PageID.902). The email attached a picture of a railing that Ms. Kooman had received from a fencing company the day before. (*Id.*). The email also contained a phone number and fax information where Ms. Kooman could be reached with any questions. No other information, including any information about Mr. Romig, was included in this message. In particular, nothing in the written submission tied the railings to a claimed medical accommodation for Mr. Romig.

Ms. Biegalle responded to Ms. Kooman's email about ten minutes later stating that she would pass the request along to the Board of Directors and let her know what their decision was. (*Id.*).

### 3. *The Boulder Bluff Board of Directors Considers the Initial Written Request*

Ms. Biegalle forwarded Ms. Kooman's email to the Boulder Bluff Estates Board members later on the 17th. (ECF No. 53-19, PageID.1004). In her message, Ms. Biegalle wrote "Below & attached is the request I received from Terry Romig to install a railing on her porch. Please review and advise whether or not you approve." *Id.* The email was sent to the six members of the Boulder Bluff Board of Directors: Walt Penrose, Bill Waalkes, Jeff Carpenter, Carol Tanis, Dave Benison, and Lisa DeVille.

The Board members then discussed Ms. Kooman's request over email. Mr. Benison began the discussion by asking whether the railing that Ms. Kooman wanted had been installed anywhere

---

[5] The Court will accordingly refer to Ms. Kooman as the sender or receiver of emails related to this email account.

else in the complex.  Mr. Waalkes also asked whether the railing would be a new installation or a replacement, and whether the cost would be paid by Ms. Romig or by the Condominium Association.  (ECF No. 53-19, PageID.1003).  In a second email dated June 18, Mr. Waalkes stated that he had gone to look at Ms. Romig's unit.  He referenced an email from Jeff Carpenter who stated that Ms. Romig wanted something for her husband to hang on to.  Mr. Waalkes added that he thought Ms. Romig would also want a railing down the steps if her husband was getting old. He concluded by stating that his decision would hinge on whether Ms. Romig was paying for the installation.  (*Id.*).  Mr. Carpenter responded a few minutes later that Ms. Romig would be "paying for it.  She wants the railing because her ex fell off the porch.  He's in bad health and quite feeble." (Carpenter Dep. 17, ECF No. 53-7, PageID.932).[6]

Ms. Biegalle then told the Board that she would request more information from Ms. Romig about the railing.  (ECF No. 53-23, PageID.1010).  On June 20, 2016, Ms. Biegalle sent Ms. Kooman an email asking for more information about the installation method and the desired location of the railing.  Ms. Kooman responded to Ms. Biegalle "I want the railing installed across the hole [sic] front porch with hand railing on the steps, LVP [Lakeshore Vinyl Products] of Hudsonville located on Chicago Dr. are the Installers, The railing will have boss flanges and be anchored to cement."  (ECF No. 1-1, PageID.50).

After this response was passed on to the Board of Directors by Ms. Biegalle, Mr. Benison sent an email dated June 21 stating that he was voting no on the request.  He stated that the railing would look out of character for the area, and holes would need to be drilled into the cement of

---

[6] This communication was read by Plaintiffs' attorney during Mr. Carpenter's deposition.  It does not appear to be located elsewhere in the record. To the extent Mr. Carpenter touched on Mr. Romig's physical condition, Mr. Carpenter explained that this was based on his personal observations.  He had no knowledge of anything specific.  (Carpenter Dep. 19-20, ECF No. 53-13, PageID.962).

Ms. Romig's condominium unit.  (ECF No. 53-19, PageID.1003).  After Mr. Benison's email, Ms. Tanis also voted no.  (*Id.*).

On June 23, Ms. Kooman emailed Ms. Biegalle to ask about the Board's decision.  She mentioned that the installation company told her that they would be able to install the railing over the July 4th weekend.  (ECF No. 1-1, PageID.57).  Ms. Biegalle replied the same day that she had not yet received approval from the Board, and as soon as she had a response, she would let Ms. Kooman know.  (*Id.* at PageID.56).  Later that day, Ms. Biegalle emailed the Board to let them know she had received four responses, and the vote was split.  She noted that Ms. Kooman was asking for an update, and that Ms. Kooman would like the work done the week of July 4th.  (ECF No. 39-5, PageID.231).

On June 27, Ms. Deville sent an email voting no, bringing the number of "no" votes up to three.  (ECF No. 39-6, PageID.234).  Following Ms. Deville's vote, Mr. Waalkes observed that since there were only six Board members, it looked like the request would not be approved.  He stated that, after thinking about it, and taking into account the Board's desire to keep things consistent, he could "easily side" with the no votes, bringing the total to four "no" votes.  (ECF No. 39-6, PageID.234).

Thereafter, Mr. Carpenter emailed Ms. Biegalle and Mr. Penrose separately.  He wrote that he did not understand the "no" votes.  He observed that there were other units in the complex that had railings, though he acknowledged those railings were installed some time ago.  He remarked that it was his opinion that the current residents of the condominium complex were aging, and that those residents would need railings.  He closed by suggesting that the Board advise Ms. Romig to install a handicap ramp, rather than railings, because similar requests had been approved in the

Board's recent past. (ECF No. 39-7, PageID.237). Ms. Biegalle replied to Mr. Carpenter on June 28, noting that she agreed with Mr. Carpenter's opinion. (*Id.*).

Ms. Biegalle followed up to the entire Board of Directors later on the afternoon of June 28. She stated she had received five responses—three "no" votes and two "yes" votes.[7] She added, "My fear is if we deny this request and she or her husband should fall than [sic] she for sure has grounds to sue the association because she did attempt to make the porch more 'handicap' accessible." (ECF No. 39-7, PageID.236).

That same day, later in the evening, Ms. Kooman sent another email to Ms. Biegalle to touch base on her request. (ECF No. 1-1, PageID.56). She stated that a week earlier, Mr. Romig had fallen off the porch and was now in the hospital with a lot of pain. Ms. Kooman wrote that the request should have been already approved and she asked for an answer from the association as soon as possible. (ECF No. 1-1, PageID.56). Ms. Biegalle then forwarded Ms. Kooman's email to the Board as an FYI. (ECF No. 53-24, PageID.1011). On June 29, Mr. Waalkes sent an email to the Board asking whether there was a legal requirement for railings on steps or porches of certain height. (*Id.*). If there was further discussion on this point, however, it does not appear to be in the record.

The last communication from a Board member is from Mr. Carpenter dated June 29th. He again emailed Ms. Biegalle and Mr. Penrose[8] separately. He mentioned he had received a

---

[7] The "no" votes appear to be from Mr. Benison, Ms. Tanis and Ms. Deville. Mr. Carpenter and Mr. Waalkes were the "yes" votes.
[8] Mr. Penrose's vote, if there was one, is not in the record.

voicemail from Ms. Romig asking why the Board had not approved the request. She mentioned that her ex-husband had fallen off the porch again.[9]

### 4. Ms. Kooman and Ms. Romig Obtain Counsel

Two days later, on July 1, Ms. Biegalle sent Ms. Romig a letter on Gerow Management Company letterhead. Ms. Biegalle remarked that she was sending the letter "on behalf of the Board of Directors of the Boulder Bluff Estates Condominium Association" and that the Board had denied the request. The denial letter stated the reasons for the Board of Directors' decision were that "the proposed railing would be a permanent change modifying the overall appearance of the unit in comparison to the rest of the association as well as the installation would cause damage to the concrete porch." (ECF No. 53-8, PageID.939).

It does not appear there was any further communication until later that month when, on July 28, 2016, counsel for the Plaintiffs sent a letter to the Boulder Bluff Estates' Board of Directors demanding that they reverse their decision. Plaintiffs' counsel stated that Terry Romig, for the benefit of Robert, "clearly qualifies to invoke the protections afforded to persons with disabilities" provided by the Michigan Condominium Act, § 559.147(a), and the Fair Housing Amendments Act. The letter demanded that the Board of Directors reverse its decision and approve the installation of railing on the porch and stairs. (ECF No. 53-9, PageID.942).

The letter included a note from Diana Dillman, DO, who appears to have been Mr. Romig's treating physician. The letter is dated July 5, 2016, and states "Robert J. Romig is disabled. He needs to have side rails and hand rails for his safety." (ECF No. 53-9, PageID.947). Based on the summary judgment record this was the first time the Board of Directors received a doctor's note,

---

[9] It is not clear if the fall Ms. Romig described was the same fall, or a different fall, than the one mentioned by Ms. Kooman in her email to Ms. Biegalle. In any event, it or they had occurred before the earliest possible installation date of the week of July 4.

or any specific medical information, regarding Mr. Romig. (Terry Romig Dep. 33, ECF No. 53-14, PageID.973; Kooman Dep. 21-22, ECF No. 50-6, PageID.742-743). The Board had no such information during its initial consideration, or before its initial denial.

### 5. *The Board of Directors Approves Ms. Kooman's Request*

On August 23, 2016, a little more than two months after Ms. Kooman first sent her request to Ms. Biegalle, the Boulder Bluff Estates Board of Directors approved Ms. Kooman's request to install railings on the porch and steps. Ms. Biegalle sent Ms. Romig a letter stating the Board of Directors had approved the request, subject to certain conditions. The conditions included that Ms. Romig acknowledge that she would be responsible for any damage and upkeep, obtaining permits and insurance, and removal if Mr. Romig moved out of the unit. Ms. Romig was asked to sign a letter agreeing to the terms and to return it to Ms. Biegalle. (ECF No. 53-10).

There is no dispute that the railing was ultimately installed, though Plaintiffs could not recall during their depositions when exactly it was installed. Ms. Romig remembered that it was warm outside when the railing went up. (Terry Dep. 24, ECF No. 53-14, PageID.971). Ms. Kooman initially testified that the railings were installed in late October 2016, but she later testified that the railings were installed right after they received approval from the Board. (Kooman Dep. 35-36, ECF No. 50-6, PageID.756-757). In any event, once installed the railings appear to have stayed up through Mr. Romig's death in January 2017.[10]

---

[10] Plaintiffs have not handled this case as one for wrongful death. No medical records or opinions, moreover, exist in the summary judgment record to tie Mr. Romig's death to any falls he experienced, much less the falls he allegedly sustained between June 17 and August 23, 2016. Following Mr. Romig's death, the Board of Directors requested that Ms. Romig remove the railing per the agreed to condition in the August 23, 2016 letter. Ms. Romig then told the Board of Directors she also needed the railings for her physical conditions, and the railings were permitted to remain up. Plaintiffs do not base any claim relating to Ms. Romig's need for railings.

## PROCEDURAL HISTORY

Plaintiffs brought this litigation on June 7, 2018. This was almost two years after the Board approved the request for the railing. The Complaint asserted that the "unreasonable denial, delays, and failure, and refusals to grant Plaintiffs' request for disability modification for the Unit was a direct and proximate cause of Robert Romig's Fall[s]." (Compl. ¶ 48, ECF No. 1, PageID.13).[11]

The Complaint originally raised three counts. Count 1 raised a claim for unreasonable denial/undue delay of Plaintiffs' reasonable modification request in violation of both federal and state law. Count 2 raised a claim for discrimination in the terms and conditions of housing, again in violation of state and federal law. Finally Count 3 alleged a violation of Michigan's Condominium Act. At the Rule 16 scheduling conference the Court declined to exercise supplemental jurisdiction over the state law claims. Thus only the claims relating to the Fair Housing Amendments Act remain. (ECF No. 17).

Defendant Gerow Management Company and the Boulder Bluff Condominium Defendants have separately moved for summary judgment (ECF Nos. 38 & 42). The motions have been fully briefed, and the Court heard argument on December 4, 2019. (ECF No. 57).

## LEGAL STANDARDS

Summary Judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Summary judgment is appropriate only if, "taking the evidence in the light most favorable to the non-moving

---

[11] The Complaint identifies two sets of falls that Mr. Romig experienced between the time that Ms. Kooman first requested the railings and the date when the Board of Directors approved the request. The summary judgment record, in contrast, does not support a finding of any particular fall before the earliest possible installation date of the July 4 weekend. This, in turn, was before the Board received any medical information on Mr. Romig. Ms. Kooman, during her testimony, provided little by way of specifics. (Kooman Dep. 23-26, ECF No. 50-6, PageID.744-47).

party, 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *La Quinta Corp. v. Heartland Props., LLC*, 603 F.3d 327, 335 (6th Cir. 2010) (quoting FED. R. CIV. P. 56(2)). In considering a motion for summary judgment, the Court draws all justifiable inferences in favor of the non-moving party. *Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 748 (6th Cir. 2012). On a summary judgment motion, "the ultimate question . . . is whether the evidence presents a sufficient factual disagreement to require submission of a particular legal claim to the jury or whether the evidence on the claim is so one-sided that [the moving party] should prevail as a matter of law." *Id.* at 748-49.

## DISCUSSION

"The FHAA makes it unlawful to 'discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap.'" *Anderson v. City of Blue Ash*, 798 F.3d 338, 360 (6th Cir. 2015) (quoting 42 U.S.C. § 3604(f)(2)). "Such discrimination includes a 'refusal to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" *Id.* (citing 42 U.S.C. § 3604(f)(3)(B)). "Plaintiffs who allege a violation of 42 U.S.C. § 3604(f) may proceed under any or all of three theories: disparate treatment, disparate impact, and failure to make [or permit[12]] reasonable accommodations" or modifications. *Id.* (quoting *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 790 (6th Cir. 1996)).

---

[12] *See Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 538 (6th Cir. 2014).

### 1. The Property Manager's Motion for Summary Judgment

The Court begins with Defendant Gerow Management Company's motion for summary judgment (ECF No. 38) based on the contention that its role, through the complained of actions by Ms. Biegalle, was purely an administrative or ministerial function. It appears undisputed the Boulder Bluff Estates Condominium Board (on which Ms. Biegalle did not have a vote) made all the decisions regarding the requested modification, and that it had this authority under the bylaws. Plaintiffs aver, however, that as the Board of Directors' agent, the property manager should be liable because Ms. Biegalle's own conduct amounted to discriminatory acts. They further allege that Gerow Management is not immune from liability just because Ms. Biegalle may have acted at the direction of the Boulder Bluff Estates Board of Directors.

"Congress intended § 3604 to reach a broad range of activities that have the effect of denying housing opportunities to a member of a protected class." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 344 (6th Cir. 1994). "When Congress amended § 3604(f) in 1988, it intended the section to reach not only actors who were directly involved in the real estate business, but also actors who directly affect the availability of housing." *Id.* "'The conduct and decision-making that Congress sought to affect was that of persons in a position to frustrate such choices—primarily, at least, those who own the property of choice and their representatives." *Id.* (quoting *Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277, 1283 (3d Cir. 1993)). Thus in the Sixth Circuit, Section 3604(f) reaches "property owners and their agents who directly affect the availability of housing for a disabled individual." *Id.* (discussing § 3604(f)(1)). Indeed, the statute "may extend further, to other actors who, though not owners or agents, are in a position directly to deny a member of a protected group housing rights." *Id.* (discussing § 3604(f)(1)).

The Supreme Court has held that "an action brought for compensation by a victim of housing discrimination is, in effect, a tort action." *Meyer v. Holley*, 537 U.S. 280, 285 (2003). Plaintiffs aver that in such an action, an agent cannot escape liability merely because the agent was acting at the behest of a principal. They point the court to *Hintz v. Chase*, No. 17-cv-02198-JCS, 2017 WL 3421979 (N.D. Cal. Aug 9, 2017) (Spero, M.J.), where the magistrate judge applied hornbook agency law to conclude that "an agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal." *Id.* at *3. Here, Plaintiffs contend that Ms. Biegalle's own conduct resulted in a discriminatory housing practice. While Ms. Biegalle may not have had a vote, Plaintiffs observe she actively participated in the Board's discussion. She further drafted the initial denial from the Board of Appeals. Plaintiffs complain Ms. Biegalle knew of Mr. Romig's handicap and did nothing to educate the Board on the illegality of their actions. Plaintiffs contend Ms. Biegalle should have sought out a legal opinion or reported the Board of Directors to a governmental agency. Her failure to do so, and actions in conjunction with the Board of Directors' decision, Plaintiffs say, amounts to discriminatory conduct by an agent prohibited under the FHAA.

Plaintiffs' argument is not well taken. While an agent might be liable for its own act constituting a tort even if acting at the command of the principal, there is no affirmative tort by Ms. Biegalle or Gerow Management on this record. Rather, the complained of conduct demonstrates that Ms. Biegalle, and by extension, Gerow Management, performed merely as a conduit; Ms. Biegalle passed information from Ms. Kooman, to the Board of Directors, and then relayed questions, and ultimately the decision, from the Board of Directors to Ms. Kooman. The agent's entire focus, then, was on conveying the Board of Directors' decision to Ms. Kooman. Moreover, to the extent Ms. Biegalle did anything beyond acting as a conduit, it was to make a

comment favorable to the Plaintiffs' position. Urging caution and providing an opinion favorable to the position of the individual alleging discrimination is not a tort and it does not amount to discrimination under the FHAA.

Indeed, courts to have examined similar claims have concluded that property managers are not liable where, as here, they acted only as a conduit between the principal and an individual claiming to be the victim of housing discrimination. For example, in *Fair Housing Center of the Greater Palm Beaches, Inc. v. Sonoma Bay Community Homeowners Association, Inc.*, 141 F. Supp. 3d 1321 (S.D. Fla. Oct. 1, 2015), a property owner required applicants to include the report cards of any prospective minor residents under the age of 18. The property manager performed activities related to facilitating communications and applications between rental applicants and the property manager. More specifically, the property manager provided blank applications, accepted completed applications, checked the completed applications to see whether the required documents were present, and passed on applications to the property owner. *Id.* at 1326. Based on these activities, the court concluded "no reasonable trier of fact could conclude that [the agent] assisted or contributed to any violation arising from [the report card requirement]." *Id.* The property manager was not liable because "[t]he principle of vicarious liability flows 'upward,' not 'downward.' Thus, an agent is not liable simply because his principal violates the Fair Housing Act." *Id.* at 1325 (quoting Robert G. Schwemm, *Who May be Liable Under the Fair Housing Act—Principals and Agents*, HOUSING DISCRIMINATION LAW AND LITIGATION § 12B:2 (July 2019)). Accordingly, "agents such as property managers can be held liable when they have 'personally committed or contributed to a Fair Housing Act violation.'" *Id.* at 1326. (citing *Sabal Palm Condos of Pine Island Ridge Ass'n, Inc. v. Fischer*, 6 F. Supp. 3d 1272, 1293 (S.D. Fla.

2014)).  But they cannot be liable for performing ministerial functions or acting merely as a conduit between the property owner and the individual alleging discrimination by the owner.

Other courts have applied the reasoning in *Sonoma Bay* to dismiss property managers or other agents who performed purely ministerial acts or acted as conduits for the ultimate decisionmakers.  *See Sheets v. Villas*, No. 8:15-cv-1674-T-30-JSS, 2016 WL 6093224 (M.D. Fla. Oct. 19, 2016) (dismissing property manager who performed only ministerial acts where condo owner sought modification of underground fence for service dog); *Sabal Palm Condominiums of Pine Island Ridge Ass'n, Inc. v. Fischer*, 6 F. Supp. 3d 1272 (S.D. Fla. Mar. 19, 2014) (dismissing attorney who advised condo board on reasonable modification request because the attorney had "no authority over" the condo association's decision, meaning "the unlawful action was fundamentally" the condo association's, not the attorney's).  The Court finds this reasoning persuasive.

All this leads the court to conclude that Defendant Gerow Management is not liable under the FHAA.  While agents might be liable for affirmative torts, the complained of actions by Ms. Biegalle in this case fail to amount to an affirmative tort on which an agent could be liable.  Accordingly, the Court grants Defendant Gerow Management Company's motion for summary judgment.[13]

### 2. Boulder Bluff Estates' Motion for Summary Judgment

The remaining defendants move for summary judgment on the basis that Plaintiffs cannot establish all the elements required to make out a claim either for failure to permit a reasonable

---

[13] Gerow would also be entitled to summary judgment based on the Court's ruling that the Board's conduct did not violate the FHAA.

modification under the FHAA or a claim for disparate treatment under the FHAA. (ECF No. 42). The Court considers each theory of liability in turn.

## A. *Failure to Permit a Reasonable Modification*

Prohibited discrimination under the FHAA includes "a refusal to permit . . . reasonable modifications of existing premises occupied or to be occupied" by a disabled individual "if such modifications may be necessary to afford such person full enjoyment of the premises[.]" 42 U.S.C. § 3604(f)(3)(A). "An FHA reasonable-modification plaintiff . . . must prove both the reasonableness and necessity of the requested modification." *Hollis v. Chestnut Bend Homeowner's Ass'n*, 760 F.3d 531, 541 (6th Cir. 2014). Furthermore, a plaintiff raising a claim for reasonable-modification must also prove that (1) he suffers from a disability; (2) that he requested an accommodation or modification; (3) that the defendant housing provider refused to make the accommodation or to permit the modification; and (4) that the defendant knew or should have known of the disability at the time of the refusal. *Id.* The gravamen of Plaintiffs' claim is that the Board acted unreasonably in taking until August 23, 2016 to approve Ms. Kooman's request.

Agency regulations require a housing provider to give "prompt responses to a reasonable modification request." *Johnson v. Jennings*, 772 F. App'x 822, 826 (11th Cir. 2019) (quoting U.S. Dep't of Justice & U.S. Dep't of Hous. and Urban Dev., Reasonable Modifications Under the Fair Housing Act 10 (March 5, 2008)). And a "denial" under the FHAA "can be actual or constructive." *Id.* at 825. Therefore, "undue delay in responding to a reasonable modification request may be deemed a failure to permit a reasonable modification." *Id.* at 826 (citation omitted). "But a duty to respond to a request is not necessarily the same as a duty to grant or deny it immediately."

*Moody v. Gongloff*, 687 F. App'x 496, 499 (6th Cir. 2017). There must be a reasonable time for a housing provider to act on any request for modification before undue delay might be found.

The period between the June 17th request and the August 23rd approval was not unreasonable. The starting point is what Plaintiffs provided to the housing provider. Here, the nondescript email that Ms. Kooman sent to Ms. Biegalle on June 17th made no mention of her father. Indeed, it provided no reason at all for the railing request. And regardless of what Ms. Kooman may have told Ms. Biegalle before sending the email, Ms. Kooman's deposition testimony establishes that she knew, after speaking with Ms. Biegalle, that she had to submit a written request to the Boulder Bluff Estates Board of Directors. Accordingly, Ms. Kooman herself contributed to much of the delay by failing to provide a complete picture when she first submitted her request to the Board of Directors. True, Ms. Kooman did mention her father in the June 28th email, but that email is nebulous at best. It mentions only a fall, and Ms. Kooman's belief that the railing would prevent injuries. It says nothing about her father's condition. Moreover, the record reflects that once the Board of Directors received a clearer picture of the situation, including a doctor's note from Mr. Romig's physician, the Board acted quickly to approve the request. All things considered, the Board could have perhaps been more proactive in ferreting out the reason for the request, but it did not act unreasonably in issuing an initial decision based on the information at hand, and then swiftly approving the request once it received more information.

In support of their argument, Plaintiffs largely point to the letter that was first sent by Ms. Biegalle that denied the request. They say it conclusively established that the Board of Directors denied a request by a disabled individual for a reasonable modification. But reality matters more than labels. *Cf. Overlook Mut. Homes, Inc. v. Spencer*, 415 F. App'x 617 (6th Cir. 2011) (affirming judgment as a matter of law against the homeowner on an unreasonable delay

theory even though the board had filed a declaratory judgment action against the homeowner on disputed legal issues); *Moody v. Gongloff*, 687 F. App'x 496 (6th Cir. 2017) (delay of 87 days from receipt of doctor's note to action on request not unreasonable). The reality here is that it look less than two months to approve the railing request. When the Board initially responded to Ms. Kooman's request it had no written communication from Ms. Kooman, Ms. Romig, or Mr. Romig, that the request for the railings related to Mr. Romig's disability. Nor did it have a doctor's note or any other medical information on Mr. Romig. The interactive process then continued, and further information was submitted, including a doctor's note, leading to an approval of the request after less than a month after the Board received concrete medical information. All this shows that the Board of Directors acted expeditiously once it was able to perform a meaningful review.

Accordingly, the Court finds that Plaintiffs have not demonstrated a failure to permit a reasonable modification claim.

### B. Disparate Treatment

Plaintiffs' second theory of liability under the FHAA alleges that defendants "violated the FHAA . . . by unlawfully discriminating in the terms, conditions, privileges of sale or rental of a dwelling[.]" (Compl. ¶ 58, ECF No. 1, PageID.15). It further alleges that "Defendants' violations of the FHAA . . . were deliberate, intentional and flagrant examples of disability/handicap discrimination." (Compl. ¶ 60, ECF No. 1, PageID.15). Based on this language, Plaintiffs are raising a disparate treatment (as opposed to disparate impact) claim. *See Graoch Assocs. # 33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n,* 508 F.3d 366, 381 (6th Cir. 2007) (Moore, J., concurring) ("[A] plaintiff may establish a violation under the FHA by showing that the defendant has an intent to discriminate ('disparate treatment') or that an otherwise neutral practice has a disparate impact on a protected class ('disparate impact').")

"To prevail on a disparate treatment claim [brought under the FHAA], a plaintiff must show proof of intentional discrimination." *Anderson v. City of Blue Ash*, 798 F.3d 338, 363-64 (6th Cir. 2015) (quoting *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 612 (6th Cir. 2012) (alterations in *Anderson*)). "Because a disparate-treatment claim requires the plaintiff to establish discriminatory animus, analysis of such a claim focuses on the defendant's intent." *Id.* at 364 (quoting *Hollis*, 760 F.3d at 539). Courts in the Sixth Circuit "therefore appl[y] the three-step *McDonnell Douglas* test, which shifts the burden of production from the plaintiff to the defendant and then back to the plaintiff in an effort to zero in on the specific intent underlying the defendant's conduct." *Id.*

> [T]his burden-shifting scheme first requires that the plaintiff present evidence from which a reasonable jury could conclude that there exists a *prima facie* case of housing discrimination. If the plaintiff is successful, the burden shifts to the defendant to offer "evidence of a legitimate, nondiscriminatory reason for" the adverse housing decision. If the defendant carries his burden, the burden shifts back to the plaintiff to "identify evidence from which a reasonable jury could conclude that the proffered reason is actually pretext for unlawful discrimination."

*Lindsay v. Yates*, 578 F.3d 407, 414–15 (6th Cir. 2009) (internal citations omitted); *accord Painter-Payne v. Vesta West Bay, LLC*, No. 2:12-cv-912, 2014 WL 4638927 (S.D. Ohio Sept. 16, 2014) (King M.J.) (applying similar analysis to plaintiff's claim the defendant violated the FHA by refusing a live-in aide in Section 8 housing).

Defendants contend that Plaintiffs have not made out a *prima facie* case and, furthermore, that they have offered legitimate, nondiscriminatory reasons for its initial decision, namely the aesthetics of the property, the potential of damage to the concrete, and the financing for the railing. Plaintiffs' respond, in the main, by incorporating their previous arguments with respect to failure to permit a reasonable modification. (ECF No. 53, PageID.873). And, perhaps to point towards

pretext, they direct the Court towards deposition testimony from several Board members that acknowledges several other condominium units in the complex had railings or ramps installed when Plaintiffs made their request. If the Board of Directors was truly worried about aesthetics, Plaintiffs aver, it would have proposed an alternative accommodation to meet their requirements.

Plaintiffs have not identified any evidence from which a reasonable jury could conclude they have established a prima facie case of disparate treatment. They have pointed to no direct evidence of intentional discrimination, nor have they shown any circumstantial evidence to create an inference of discrimination. *See Lindsay*, 578 F.3d at 415 (setting out what must be shown in order to make a prima facie case of housing discrimination). There is no evidence of any animus towards Mr. or Ms. Romig because of Mr. Romig's disability in the available email discussion. The focus instead was on maintaining consistent aesthetics and the soundness of the building. The individuals who were most familiar with Mr. Romig and his family—Ms. Biegalle and Mr. Carpenter—were favorable to his position.

Even if Plaintiffs had set out a *prima facie* case, they have not shown the proffered reasons in the initial response was pretext for unlawful discrimination. Plaintiffs suggest that the fact that the Board of Directors previously approved railings and ramps demonstrates that the reason their request was denied was because of Mr. Romigs' disability. But Plaintiffs fail to demonstrate that the previous approval of these requests is somehow evidence of discrimination. The record, moreover, contains no specifics with respect to these alterations. No information regarding when they were installed, where on the property they were installed, and how and why the installations came about is in the record. Indeed, the most natural reading of the record is that these were modifications that the Board of Directors had approved for other disabled individuals. Jeff Carpenter in an email on June 27, 2016, stated that the Board had installed porch rails on a number

of other units, and that he thought a lot the residents were aging and would need similar installations. He suggested installing a "handicap" ramp, noting the Board had approved such requests in its recent past. (ECF No. 53-21, PageID.1008). Accordingly, the fact that the Board may have installed railings and ramps in the past does not appear to support Plaintiffs' claim of disability discrimination. If anything, it shows the Board of Directors would include modification requests, when the Board had complete information (and as later demonstrated by the Board's subsequent approval of the Romigs' request).

Accordingly, the Court concludes that Plaintiffs have not made out a claim of disparate treatment housing discrimination under the FHAA.

## CONCLUSION

This case is actually a success story in a Board's reasonable accommodation of a resident's disability. In just two months from the initial contact, the Board approved the requested railings. During that two month process, the interactive process moved from an initial nebulous request, unsupported by any medical documentation, that the Board found inadequate. The homeowner responded with additional information, including a doctor's note and specific medical details. The Board promptly approved the modification and the homeowner installed the railing.

All that was in place no later than the late summer or early fall of 2016. Then, out of the blue nearly two years later, Plaintiffs sued and alleged the Fair Housing claims. At the Summary Judgment hearing, it appeared that the primary concrete damages Plaintiffs have to assert are the attorney fees and costs the Plaintiffs' lawyers incurred during this litigation itself. That is not the way the Fair Housing Act is supposed to work.

**ACCORDINGLY, IT IS ORDERED.**

1. Defendant Gerow Management Company, Inc.'s Motion for Summary Judgment (ECF No. 38) is **GRANTED.**

2. Defendant Boulder Bluff Estates Amended Motion for Summary Judgment (ECF No. 42) is **GRANTED.**

3. The remaining motions in limine, submitted a motion in advance of the then-scheduled final pretrial conference (ECF Nos. 59, 63 & 70) are **DISMISSED AS MOOT.**

4. This case is **DISMISSED.**  A separate Judgment shall issue.


Dated:    February 10, 2020                    /s/ Robert J. Jonker
                                               ROBERT J. JONKER
                                               CHIEF UNITED STATES DISTRICT JUDGE